UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | **CASE NO. 1:18-CR-129** |
| **Plaintiff,** ) | |
| ) | **Judge: John R. Adams** |
| -vs- ) | |
| ) | |
| ) | **DEFENDANT'S SENTENCING** |
| **COLIN TENNEBAR,** ) | **MEMORANDUM** |
| ) | |
| **Defendant.** ) | |

Defendant Colin Tennebar, by and through his undersigned counsel, respectfully submits this Sentencing Memorandum to present factors for the Court's consideration in determining a sentence that is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

Defendant has entered a plea of guilty to a one-count indictment charging him with making a false statement to the Federal Bureau of Investigation in violation of 18 U.S.C. § 1001(a)(2). The written Rule 11(c)(1)(B) Plea Agreement stipulates to an adjusted offense level of 17 *before acceptance of responsibility*, and further stipulates that, with an agreed reduction for acceptance of responsibility under U.S.S.G. § 3E1.1(a) and (b), Defendant's Total Offense Level will be 14. With a criminal history computation of zero (placing Defendant in Criminal History Category I), the U.S.S.G. imprisonment range for a Level 14 offense is 15 to 21 months.

The parties' written Plea Agreement further provides that "Neither party will recommend

or suggest in any way that a departure or variance is appropriate, either regarding the sentencing range or regarding the kind of sentence." Consistent with this agreement, the matters set forth in this Sentencing Memorandum are presented solely in support of Defendant's request for a sentence at the low end of the Guidelines range, and shall in no wise be construed as a request for a departure or variance.

## PERSONAL AND WORK HISTORY

Defendant grew up in Brecksville, Ohio, and graduated from Brecksville High School. After high school, Defendant attended Thiel College in Pennsylvania, and graduated in 2005 with a Bachelor's degree in business administration. Defendant (with guidance from his mother) selected Thiel College because he suffers from adult Attention Deficit Hyperactivity Disorder, and Thiel offered special programing that enabled him to develop skills in dealing with his ADHD.[1]

After college, Defendant entered corporate sales, and following a brief stint selling office equipment, entered the medical field selling medical equipment and supplies for large corporate manufacturers. Over the next decade or so, Defendant slowly climbed the corporate ladder, changing jobs on a frequent basis as his skills and knowledge of the medical field increased, and better job opportunities presented themselves, until 2015 when Defendant was offered and accepted a position with Abbott Vascular. Although Defendant's job with Abbott was technically a sales position (selling vascular equipment and devices), Defendant was given

---

[1] Defendant has never been officially been diagnosed with ADHD because his mother (a school teacher certified in special education who taught special needs/learning disabled children and recognized the symptoms of her son's ADHD) did not want him taking the medications routinely prescribed for ADHD children in that era.

training leading to certification in peripheral vascular disease, and his job responsibilities entailed assisting vascular surgeons in the operating room when deploying the medical devices manufactured by Abbott.  With base salary, commissions, full benefits (health and disability insurance, 401(k), etc.) and a company car, Defendant was earning in excess of $250,000.00 per year.  Through dint of hard work (after graduating from college, Colin routinely worked 50 to 60 hours per week in the various positions that he held), Defendant had achieved his "dream job" working for a recognized leader in the medical industry (Abbott is the fifth largest corporation in the United States), and while he hoped to advance further within the ranks of the company, Defendant planned never to leave Abbott.  He lost all of this and was promptly fired by Abbott as a result of his arrest in this case.

After being terminated by Abbott, the only work Defendant could find was as an independent, "manufacturer's representative," for smaller medical equipment suppliers. As a manufacturer's representative for three separate manufacturers, Defendant works as a commission-only, independent contractor who locates and services customers for the manufacturer, and is paid a commission on the products that the customer purchases or uses.  He no longer receives a base salary, the full benefits package, or the company car that he had while he was employed by Abbott, and is required to pay all of his family health insurance costs, business expenses, and taxes out of the gross commissions he is paid, which vary from month to month.

In addition to the somewhat regular (albeit variable in amount) commissions that Colin earns from the three manufacturers that he formally represents, he sporadically finds opportunities to make a one-off, one-time sale of other medical equipment or supplies.  For

example, Colin might learn of a hospital or clinic that over-purchased and is over-stocked on a particular *dated* medical supply or product (i.e., a product with a limited shelf life that is approaching expiration date), and through his contacts in the medical community, Colin is able to arrange for a sale of the oversupply to another health care provider, yielding extra commission income that enables him and his family to make ends meet.

Although Colin does business under the name "CTI," he is a sole proprietor, CTI is simply a trade name or "doing business as" name that he uses for business convenience, and all income generated under the name CTI is reported on Colin's personal 1040 tax return.[2]  CTI has no existence, no structure, no employees and no value separate and apart from Colin, and the business will not be able to survive for long once Colin is incarcerated, since the business is able to generate income solely because of Colin's specialized knowledge of the products sold and his experience in medical sales in general.  Colin is hoping that, once he is taken into custody, his wife Chelsea will be able to service and maintain the existing lines he maintains for the three manufacturers that he regularly represents.  This by itself will be challenging for Chelsea since she has two young children to care for, and no significant prior work experience except as a child care provider and waitress.  It is a virtual certainty that she will not be able to find and complete the "one-off" sales opportunities that up until now have netted the additional income that has enabled Colin and his family to pay the mortgage on the home they purchased while Colin was working for Abbott, and make ends meet.

---

[2] Although Colin did, at one point in time, form an Ohio Subchapter S corporation named Colin Tennebar, Inc., that also used "CTI" as a trade name, the corporation ceased all business activity prior to Colin's arrest.  "CTI" currently refers to Colin's personal business activity as a sole proprietor.

If Colin receives a sentence at the low end of the guidelines, Chelsea may be able to hold onto enough of the business in his absence that there will be something left for him to rebuild when he is released.  A sentence at the upper guideline range will likely guaranty failure of the business and have him (and Chelsea) facing foreclosure on the family residence when he is released and able to resume work.

## MITIGATING FACTORS

Defendant has accepted full responsibility for his offense behavior, has formally apologized to the FBI and to his family for the burden and expense he has caused them, and has expressed extreme remorse as more fully set forth in the Presentence Report.  Without in any way diminishing Defendant's full acceptance of responsibility, there are, however, mitigating circumstances that, in the opinion of undersigned counsel, should be taken into account in determining a sentence that is sufficient, but not greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

1. On the morning of April 12, 2017 (the day of the "storage locker" incident recounted in the indictment), Colin was driving back home to Brecksville after a business meeting with his supervisor and an important Abbott customer in Pennsylvania, when he received two telephone calls from his wife, Chelsea.   The first telephone call informed him that the FBI had been to his house and wanted to talk to him.  In the second call, Chelsea informed Colin that their son Trent (who at that time was not yet one year old) was running a high fever, and that she was taking him to the Doctor's office in North Olmsted.  Colin began "freaking out."

2. Colin tried to call his mother and his twin brother Ryan but was unable to reach either of them because the FBI was at that time in the course of conducting a search of his mother's

home (where Ryan then lived), as well as Ryan's office, and the FBI had seized Ryan's phone. Because the FBI had custody of Ryan's phone, there was no communication between Ryan and Colin prior to their chance encounter after Colin returned the Brecksville area, the two of them spotted each other while driving in opposite directions on Mill Road, and Ryan hand-signaled Colin to stop, then jumped into Colin's car with a pair of bolt cutters and ordered Colin to drive him to a storage locker.

      3.  Colin had no knowledge (until he was told while in the car) that Ryan had been renting a storage locker for six months, much less any knowledge of what that locker contained. Despite this, he precipitously caved-in to Ryan's demands, drove him to the storage unit, and helped him remove two "bins" that he believed contained dressing kits for wound VACs.

      4.  Documents previously filed with this court under seal (*see* ECF # 53), demonstrate that, at the time of these occurrences, Colin was suffering from a serious undiagnosed physical ailment with cognitive side-effects that impaired his executive functioning. Although Colin's physical/mental ailment does not justify or excuse his conduct, it shows that his poor judgment and precipitous behavior was the result of factors not likely to re-occur now that he has been treated for and has fully recovered from the underlying condition.

      5.  Character letters submitted to the Pretrial Probation Officer uniformly describe Colin as a hard-working man who loves his family and takes seriously his role as a parent; is generous to a fault in terms of providing assistance to friends, neighbors, patients, and co-workers; has suffered and will continue to suffer financially as a result of his arrest and felony conviction; and is extremely remorseful for what he has done.

## **CONCLUSION**

For the foregoing reasons, undersigned counsel respectfully request that the Court impose a sentence at the low end of the Level 14 Guideline range.

Respectfully submitted,

*/s/ John B.  Gibbons*
**JOHN B.  GIBBONS (0027294)**
Attorney at Law
55 Public Square, Suite 2100
Cleveland, OH 44113
216-363-6086 (voice)
216-363-6075 (fax)
email: jgibbons4@sbcglobal.net

*/s/ Orville E. Stifel, II*
**ORVILLE E. STIFEL, II, CO., LPA**
By: Orville E. Stifel, II  (No.0039776)
5310 Franklin Blvd.
Post Office Box 602780
Cleveland, OH 44102
216-225-9855
216-640-3080 (fax)
email: ostifel@roadrunner.com

## **CERTIFICATE OF SERVICE**

      The foregoing Defendant's Sentencing Memorandum was electronically filed on February 13, 2019. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

      */s/ Orville E. Stifel, II*